# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | |
|---|---|
| WANDA REDD, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION G-13-00210 |
| § | |
| STP NUCLEAR OPERATING COMPANY, § | |
| § | |
| *Defendant*. § | |

## MEMORANDUM, OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendant STP Nuclear Operating Company ("STP"). Dkt. 30. Having considered the motion, response, reply, and applicable law, the court is of the opinion that the motion should be GRANTED.

## I. BACKGROUND

This is a sex discrimination case. Plaintiff Wanda Redd began working at STP's predecessor, Houston Lighting & Power Company ("HL&P), as a stenographer in 1980. Dkt. 30 & 30-1 (Pl. Dep.) at 10. In the thirty-plus years that Redd worked for HL&P/STP, she received numerous promotions. *Id.* at 11–21. In 2012, Redd was a Manager of Records Management Systems & Administration and a member of the Senior Management Team. Dkt. 33-3 (Redd Aff.)

Unfortunately, on February 22, 2012, Redd received a phone call that "changed her life at that moment." *Id.* Her 13-year-old grandson had taken his own life. *Id.* Redd understandably was dealing with extreme grief after this tragedy, and she ended up taking a substantial amount of time off of work. She initially returned to work in March 2012, after taking leave for two weeks to spend time with her family in Nebraska. Dkt. 30-2 (Pl. Dep.) at 117. Redd worked for about a month, but

she then took a leave of absence because she found it difficult to interact with people and especially concerned coworkers who asked about her grandson or how she was doing. *Id.* at 173–74.

On April 25, 2012, Redd sent an email to her supervisor, George Harrison, stating that her retirement date would be July 12, 2012. Dkt. 30-3 at 38 (Dkt. 30, App., Ex. 3). On April 26, Redd sent another email to Harrison stating, "I may slide my date a week or two, I need to talk to Benefits first; Thx George." *Id.* Harrison responded that he understood. *Id.* On April 27, 2012, Redd sent another email to Harrison stating, among other things, "I have decided NOT to retire yet; but I am going to have to take some time off. My blood pressure is off the chart and am sending Connie Maliff in Medical my physician's statement." Dkt. 30-5 at 17 (Dkt. 30, App., Ex. 50). Redd stated that she would be off for at least four weeks and that she needed "some time to heal physically and emotionally." *Id.*

On April 29, 2012, Redd again emailed Harrison about time off, stating, "I have every intent to return to work, but before I have a stroke or implode, I just have to take some time off. Taking some new med for my blood pressure plus some other things. . . ." Dkt. 30-5 at 18 (Dkt. 30, App., Ex. 51). On April 30, 2012, Harrison replied, "I have and will not give up on you. Take some time to heal." *Id.* On May 17, 2012, Redd emailed Harrison, reminded him that she told him on April 27 that she had decided not to retire, and then noted that she had heard that Harrison was making decisions about staffing without her input. Dkt. 30-5 at 21 (Dkt. 30, App. Ex. 54). She told Harrison that she wished that he had given her "a little time or at least talked to [her] about [his] plans." *Id.* She then stated that she was "disappointed in a lot of things" but knows "it's just business and time doesn't wait for [her] or anyone else." *Id.* Then she stated that others had "always told [her] not to tell anyone if I was thinking of retiring" and that she should have listened. *Id.* She ends the email by noting that she has another doctor appointment coming up and said, "Regarding my retirement,

I don't know, but I understand you have to [do] what you have to do." *Id.* Harrison emailed her back and indicated there was a "misunderstanding" and that the "last thing [he] would want to do is jeopardize [his and Redd's] friendship." *Id.* at 20. He told Redd that her "position [was] safe." *Id.* He apologized for not "engaging" Redd about the decisions, and noted that he thought he "was being respectful of [her] time off." *Id.*

On June 20, 2012, Redd emailed Gerald Lewis and Bobbie LaSaint and copied Harrison. She asked them to forward the email to the "RMS&A team." Dkt. 30-5 at 25 (Dkt. 30, App., Ex. 60). She said she wanted to "quiet the rumor mill," noted that she was "on medical leave and will be out for quite a while," and stated that she would not be making a decision regarding her retirement until her health issues were resolved. *Id.* She sent a separate email to Harrison stating that she would be out until September 20, 2012. Dkt. 30-5 at 26 (Dkt. 30, App, Ex. 61). She stated that it did not look like she would be able to help Harrison with the Business Plan. *Id.*

On August 18, 2012, Redd emailed Harrison again and stated that even if the physician released her in September, she would like to use her remaining 2012 vacation and floater days and then, if she does not have enough days, work from home until the end of the year. Dkt. 30-5 at 28 (Dkt. 30, App. Ex. 69). Then, she stated, "On January 1, 2013, I would like to declare my retirement, take all of my 2013 vacation/floater time, which should take me to an official retirement date of around February 28, 2013." *Id.* She thanked Harrison for his support and apologized for not helping with the Budget and Business Planning cycle. *Id.* On August 22, 2012, Redd emailed Harrison again and stated that "[r]etirement is most likely the answer" and that she would "be back [in town] on September 11, go see [her physician] on the 18th and then make a decision." *Id.* at 29.

On September 18, 2012, Redd emailed Harrison and stated, "George - I am sorry I am unable to return to work." Dkt. 30-4 at 8 (Dkt. 30, App., Ex. 10). She indicated that Connie Miliff had sent

3

her a package to apply for long term disability, and that her physician was going to complete his portion of the packet and Redd would send it all in. *Id.* Redd noted that if the long-term disability were not approved, "then I guess that will be it. I will then be forced to retire. Not sure what all is entailed, but will work with Connie and Liberoni and the Liberty Mutual people." *Id.*

On November 13, 2012, Redd emailed a large group of people. Dkt. 30-4 at 10 (Dkt. 30, App. Ex. 12). It was entitled, "The next chapter." *Id.* She wrote, "I have made a decision not to return to STP. I haven't declared my last official day, but it will be in early December. At this time in my life, my focus is my family." *Id.* On November 14, 2012, she emailed four other people at work. Dkt. 30-4 at 12 (Dkt. 30, App. Ex. 13). She stated: "While I haven't declared my last official day at STP, it will be at the first part of December." *Id.* On the same day, she separately emailed ten people and said, among other things, "My last official day will be early December." *Id.*

On November 29, 2012, Miliff advised Redd that her last paid day was December 5, 2012. Dkt. 30-4 at 15 (Dkt. 30, App., Ex. 18). On December 3, 2012, Liberty Mutual sent Redd a letter denying her claim for long-term disability because the medical information provided did "not support a level of impairment that would preclude [Redd] from working as a Manager." *Id.*

On December 7, 2012, Redd had another change of heart. She emailed Harrison and stated, "I have reconsidered my situation and have decided not to retire at this time. I recognize I will not get paid Thursday, December 6 but will return on Monday, December 10 but only for ½ day, two days a week. . . . I have a new physician's statement that I will provide . . . ." Dkt. 30-4 at 20. Harrison responded, "Wanda - Due to this unanticipated request and that I am on vacation the first part of the week, do not come back to work. I will get back to you later next week to discuss." *Id.* Redd replied, indicating that her doctor had released her to work on the 10th and that since she was

4

out of paid time she needed to work, but that she would not report to work on Monday as he had directed. *Id.*

On December 12, 2012, Harrison sent Redd an email that outlined their communications regarding her retirement. Dkt. 30-4 at 22 (Dkt. 30, App., Ex. 25). He then stated that he was "sorry to have to tell [her] that when [she] said to [him] three months ago [that she] would never be coming back and would either go on LTD or retire, [he] took specific steps based on the clear understanding that [she] would not be returning." *Id.* Harrison informed Redd that her job duties had been reassigned and that he had no position to offer her. *Id.* He told her that whether or not she completed the papers to retire was "entirely up to [her]." *Id.*

Later that evening, Redd emailed Harrison and copied Michael Meier. Dkt. 30-4 at 23 (Dkt. 30, App. Ex. 27). Redd stated that others had stated their intentions to retire and then recanted, "and positions were created for them." *Id.* She went on to say, "I'm assuming you have terminated me so as your e-mail states returning to work is not an option that will be afforded me." *Id.* The next morning she wrote Harrison another email, entitled "friend." Dkt. 30-4 at 24–27 (Dkt. 30, App., Ex. 27). After an introductory paragraph in which she indicates she wished that Harrison had given her more consideration after her years of service and that she would have at least hoped for an arrangement similar to "Debbie Towler and some others who were placed in created positions when they changed their minds about their intent to retire," Redd stated, "I never formally signed any retirement papers, but rather discussed retirement over lunch and over the phone and thru texts with you my 'friend' during a time in my life of tragedy and extreme emotional turmoil and while under some significant medications. . . . You say you have no position for me but we both know my 'position' is still there, but you cut the budget. Cutting my salary from the budget shows the bosses a nice 'cost savings' you can be proud of." *Id.* She proceeded to tell Harrison that what he "[wa]s

5

doing [wa]s slimy" and that he was "no friend." *Id.* She stated that it "smells, not only from a discrimination standpoint but It [sic.] seems I am being punished for my medical and emotional illness. But then I would have to get a legal opinion as I am not an attorney. . . ." *Id.*

In his response, Harrison noted that Redd's position was different than the other employees who had temporarily pushed off planned retirements because Redd had been off for seven months and had been steadfast in saying she was not coming back. *Id.* He stated that he eliminated Redd's position because she said she was not coming back. *Id.* Redd then wrote a very long response. *Id.* She stated that she had asked for donations of unused vacation and was told that she was not eligible even though there is always management discretion in such decisions. *Id.* After questioning several other statements Harrison had made, Redd stated, "Please just confirm if you have terminated me and if so, what is the effective date was [sic.] so I can make some decisions of my own about how to move forward." *Id.*

On December 18, 2012, Redd again emailed Harrison. Dkt. 30-4 at 28 (Dkt. 30, App. Ex. 28). She copied Meir and Shelton. *Id.* Basically, she asked for a clarification with regard to her employment status. *Id.* Shelton responded that Redd's employment ended on December 5, 2012, and had been "coded as retirement, consistent with [Redd's] stated plans and [her] having exhausted all benefits for which [she was] eligible." *Id.* Shelton advised that there was no position available for Redd to work part-time, as she had requested. *Id.* Shelton testified that she had checked to see if there were any openings consistent with Redd's skills and abilities, but there were none. Dkt. 30-2 at 31 (Dkt. 30, Shelton Dep. at 32).

On June 6, 2013, Redd filed this lawsuit. Dkt. 1. She initially claimed discrimination and retaliation under the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Title VII of the Civil Rights Act of 1964. *Id.* On January 31, 2014, Redd amended her

6

complaint to assert only a sex discrimination claim under Title VII. Dkt. 20. STP moves for summary judgment to be entered in its favor on the claim, arguing that there was no adverse action because Redd stated she was retiring, there are no similarly situated comparators who were treated more favorably, and, regardless, there was a legitimate nondiscriminatory reason for why Redd no longer works at STP—her job had been eliminated after she stated that she was going to retire. Dkt. 30. Redd argues that summary judgment is not proper because similarly situated male employees had been able to change their minds about retiring and continue working at STP, and Redd presents evidence that she claims calls into question STP's alleged nondiscriminatory reason for forcing Redd to retire. Dkt. 33.

## II. LEGAL STANDARD

**A.      Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id* . "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*,

276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

**B.     Title VII**

Title VII makes it unlawful for an employer to discharge an employee because of his or her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Urbano v. Continental Airlines Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)). When a plaintiff offers only circumstantial evidence, the *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination, which, if established, raises a presumption of discrimination. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179-80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817 (1973)). To establish a *prima facie* case, the plaintiff must show that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated" or the plaintiff was replaced by a non-minority. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006) (quoting *Rutherford*, 197 F.3d at 184); *Jatoi v. Hurst-Eules-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987). The Fifth Circuit has held that only "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating, satisfy the "adverse employment action" element of a *prima facie* case of discrimination. *See Hunt v. Rapides Healthcare Sys., LLC* , 277

F.3d 757, 769 (5th Cir. 2001). The plaintiff must raise a genuine issue of material fact as to all four elements of his or her *prima facie* case of discrimination. *Id.*

If the plaintiff successfully establishes a *prima facie* case of discrimination, the employer must then produce a legitimate nondiscriminatory reason for its adverse employment decision. *Id.* Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates and the burden shifts back to the plaintiff-employee to raise a genuine issue of material fact that the nondiscriminatory reason is merely pretextual in order to survive summary judgment. *Id.* To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). A plaintiff may establish pretext by showing either (1) the reason offered by the employer is untrue, or (2) the reason is true, but the plaintiff's protected characteristic was a motivating factor in the adverse decision (the "mixed-motives" alternative). *Id.*; *Keelan v. Majestco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). If "'the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred,' the employer may be entitled to judgment in its favor." *Price v. Fed. Express Corp.*, 283 F.3d 715, 724 (5th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097 (2000)). "Whether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Id.* at 720 (quoting *Reeves*, 530 U.S. at 148-49). The plaintiff bears the ultimate burden of persuading the trier of fact, by a preponderance of the evidence, that the employer intentionally discriminated

against him or her because of his or her protected status. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219–20 (5th Cir. 2001).

### III. ANALYSIS

STP makes several different arguments as to why it believes the court should grant summary judgment in its favor, but the most convincing is that Redd has no evidence that others similarly situated were more favorably treated. *See* Dkt. 30. Redd claims that the following individuals announced their retirement and then changed their minds: Ron Baker, Chet McIntyre, Debbie Towler, Wayne Bemis, Cliff Buede, Mike Defrees, Leonard Earls, Rick Granthom, Wayne Harrison, Jesse Wells, Bruce Mankey, Bill Minton, Ted Riccio, and Vance Verbek. Dkt. 33 (citing Coates Dep.). Redd contends the male employees in the list above "were similarly situated to the Plaintiff, they were all exempt employees such as she, most of whom were managers or higher and they all reported to a [manager] or Vice President of STP and being similarly situated means employees with similar positions, qualifications, and pay rate as Plaintiff." *Id.*

Redd has not met her burden of demonstrating that there is an issue of material fact with regard to similarly situated employees. To show that a comparator is similarly situated, an employee must "demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). The "plaintiff's conduct that drew the [alleged] adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* Additionally, if the difference between the plaintiff's conduct and the alleged comparator's conduct is what caused the difference in treatment, then the employees are not similarly situated. *Id.*

The first problem with Redd's evidence that these other employees were similarly situated is that she offers no evidence that they were similarly situated in positions, qualifications, and pay. Instead, she provides only a conclusory statement that they were, with no citations to evidence to back that assertion up. The second problem is that even if they were all similarly situated to Redd in those ways, there is no evidence that their situations were similar enough to be considered comparators. While Redd's list of employees and supporting testimony indicate that the other employees had announced plans to retire and changed their minds, there is no evidence that these other employees did so more than once or that any of them had been on extended leaves of absence that required their duties be reassigned when they announced plans to retire.[1] Moreover, Redd does not provide any evidence that these other employees had advised numerous other employees at STP that they would not be returning to work. Redd announced that she planned to retire in April and then almost immediately changed her mind. Then, as demonstrated by the facts outlined above, she went back and forth with her "decision" regarding retirement, leaving her employer wondering for months whether she would be coming back or not.[2] When it finally appeared that Redd had made a definite decision, stating she would not be back to work and noting that if she was not approved for long-term disability she would be forced to retire, STP reasonably relied on that representation and reassigned her duties. These differences account for STP not being able to allow Redd to return to her former position when she changed her mind about retiring. Redd has failed to raise an issue

---

[1] Harrison testified that when Redd advised in September 2012 that she would not be coming back, he reassigned her former role to Ruby Owens and Jerry Lewis. Dkt. 35, Harrison Dep. at 37–38.

[2] The court understands the severe emotional turmoil with which Redd was dealing when she was emailing Harrison about her indecision with regard to her future during her leave. The court, however, believes that Redd's indecision during this time period provides context for Harrison's decision to permanently reassign her duties when he thought that she had definitely made up her mind to not come back to work.

of material fact with regard to the similarly situated comparator prong. She has thus not raised a prima facie case of discrimination. STP's motion for summary judge is therefore GRANTED.

## IV. Conclusion

STP's motion for summary judgment is GRANTED. Redd's claim is DISMISSED WITH PREJUDICE. A final judgment will be issued concurrently with this memorandum opinion and order.

Signed at Houston, Texas on November 25, 2014.

_____
Gray H. Miller
United States District Judge